PER CURIAM.
Eric Kurt Patrick appeals his conviction and sentence for the first-degree murder of Steven Schumacher. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm.
BACKGROUND
Eric Kurt Patrick was recently released from prison and homeless when he met Steven Schumacher at Holiday Park during a rain shower when both men took shelter under a pavilion. Schumacher invited Patrick to lunch, then to stay with him at his home until Patrick was back on his feet. On the night of Sunday, September 25, 2005, Patrick beat Schumacher to death. Patrick left Schumacher’s apartment and took Schumacher’s truck and parked it at the Tri-Rail station. Patrick withdrew approximately $900 from Schu-macher’s bank account using his ATM card in three separate transactions. Patrick was arrested after a separate, unrelated encounter with Deputy Kurt Bukata. Patrick confessed to beating Schumacher, stated that he was afraid Schumacher was dead, and that he didn’t mean to kill him.
On November 9, 2005, Patrick was charged by indictment. The jury trial began on February 2, 2009. At trial, the State called twelve witnesses during its case-in-chief.
On the night of the murder, Patrick and Schumacher drank beers and went to bed. Patrick gave Schumacher a massage, then they both lay naked in bed. According to Patrick, Schumacher attempted anal sex, which Patrick refused. Patrick stated that Schumacher was “riding up on me squeezing me.” After Patrick told him to stop, Schumacher stopped but tried again later. Patrick then explained that he “cut loose on [Schumacher].”
Patrick admitted and the evidence verified that Patrick beat Schumacher in the bedroom, beginning in the bed. He began hitting Schumacher with his fists but also beat him with a wooden box because his hands hurt so badly. Schumacher’s nose was broken and his face was cut. He was hit so hard that his teeth were broken. Patrick then tied up Schumacher using a telephone cord at the base of the bed, then taped his mouth when Schumacher yelled for help. Patrick did not want Schumacher “to go to the law” on him. Patrick put Schumacher in the bathtub on his side where Schumacher was later found dead.
Jenny Scott and Robert Lyon, Schu-macher’s friends, usually saw him daily. They last saw Schumacher on September 25, 2005, when they went over to offer him dinner. Scott did not hear from Schu-macher and she also noticed his truck was missing. When Scott went to cheek on Schumacher on Tuesday, he did not answer so she called the Sheriffs Department.
Deputy James Snell responded to Scott’s call. They both went into the apartment and saw that the bedroom was dark and disarrayed. Both Deputy Snell and Scott saw blood stains throughout the room. At that point, Scott ran out of the apartment. Deputy Snell found Schu-macher’s body in the bathtub. The body was very bloody and the hands and ankles were bound in the baek; the head and face were taped, with the face resting on the drain. The pants were pulled down although still on the body. The body was cold and stiff and the blood had pooled. The ankles were bound with torn sheets and a knotted lamp cord. The wrists were bound by a telephone cord and tape. There was bruising on an elbow, the chin, and the top of the head. Thé tape on the head went both horizontally and vertically and there was a pillow case folded over the *1054 mouth under the tape. The tape seemed to be one continuous piece. Deputy Snell informed Scott that Schumacher was dead. Scott then provided the police with a description of Patrick.
The deputies found no evidence of forced entry into the apartment. Additionally, they discovered that the air conditioning was set at sixty degrees so all the windows had condensation on them. In the kitchen trash, the deputies found tape matching that used on Schumacher’s face. Schumacher’s wallet was in the living room. There were bloody footprints on the tile, a large blood stain on the bedroom carpet, and blood spatter on the dresser and wall. The bedroom lamp was cracked and missing its cord. A cord was in the bed under the sheets. There was blood spatter on the sheets and headboard. Teeth were found in the bedclothes. A broken box with blood on it was under the dresser.
Deputy Kurt Bukata ran into Patrick at a gas station and arrested him on an outstanding warrant. Patrick had injuries on his knuckles and was carrying a duffel bag. Patrick also had some abrasions on his upper body. Bukata inventoried the duffel bag and found blood-stained boots, jeans, briefs, and socks. He told Bukata that he had been involved in a fight with some men over his shoes. DNA tests identified Schumacher’s blood on Patrick’s jeans.
The trial ended on February 20, 2009, with the jury finding Patrick guilty of first-degree murder, kidnapping, and robbery.
On June 12, 2010, the court reconvened for the penalty phase. The State introduced two stipulations into the record. The State introduced a certified copy of Patrick’s conviction for armed carjacking on April 17, 1998, for which he was sentenced to nine years’ imprisonment. The State also introduced a certified copy of a document from the Department of Corrections showing that Patrick was released on August 9, 2005, and remained in the controlled release program until February 8, 2007. The State called Scott Tison and Dawn Allford. The defense called seven witnesses: Dorothy Dolighan, a friend of the family who grew up with Patrick’s mother in Berlin, Germany; Carsten Patrick, Patrick’s brother; Philip Arth, an investigator with the Broward County Public Defender’s Office and former Ft. Lauderdale police homicide detective; Patrick’s mother, Ingrid Franke; Father Jerry Singleton, the pastor at St. Anthony Catholic Church; Patrick, himself; and Dr. Christopher Fichera, a licensed clinical and forensic psychologist.
On August 20, 2009, the trial court conducted the final sentencing hearing, pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993). The defense called two experts, and Patrick and his mother made statements to the court. The defense presented a Spencer memorandum in support of a life sentence. Dr. Fichera and Dr. Allan Ribbler, also a licensed psychologist, testified.
On October 9, 2009, the court issued its sentencing order. The court imposed the death penalty for the murder of Steven Schumacher. The court sentenced Patrick to a mandatory life imprisonment term for the kidnapping as a prison releasee reof-fender, to run consecutive to the death sentence. In its sentencing order, the trial court found six aggravators[1] and sixteen *1055 non-statutory mitigating circumstances.[2] The Court sentenced Patrick to thirty years as a violent habitual felony offender, with a fifteen-year minimum-mandatory term for the robbery, to run concurrent with the life sentence. Patrick now appeals raising seventeen claims.
We do not find that any of Patrick’s guilt phase claims warrant relief and find the evidence sufficient to support his conviction. We therefore affirm the conviction. Likewise, although we strike the trial court’s finding of the CCP aggravator, we find the sentence of death proportionate and affirm the sentence of death.
ISSUES ON APPEAL
Juror Disqualification
In the first issue on appeal, Patrick alleges that the trial court erred by striking jurors before the defense had an opportunity to question them during voir dire. The State alleges that the trial court merely disqualified jurors based on hardship and that it was within its discretion to do so. We agree. The trial court acted within its discretion to strike the contested jurors for hardship.
On February 4, 2009, the court began with the first panel of prospective jurors and questioned them for qualification purposes. The trial judge did not dismiss any of the jurors after establishing the preliminary qualifications and, instead, permitted the State to begin voir dire. Because the questioning ran late into the day, the trial court stated her preference to strike those jurors who the State and defense could agree would not be needed. The State asked that certain jurors be stricken for “cause” and the trial judge agreed based on “hardship.” The prospective jurors at issue are those that the defense requested to question but who were excused by the trial court without such questioning. Both removal for cause and removal for hardship fall within the discretion of the trial court. However, before striking a death-scrupled juror for cause at the State’s request, “defense counsel must be afforded an opportunity to rehabilitate jurors who have expressed objections to the death penalty or conscientious or religious scruples against its infliction.” Sanders v. State, 707 So.2d 664, 668 (Fla.1998).
We agree with the State that the trial court excused the jurors for hardship. Section 40.018, Florida Statutes (2008), *1056 provides that a person may be excused from jury service upon a showing of hardship, extreme inconvenience, or public necessity. § 40.013(6), Fla. Stat. (2008). Before a jury is sworn, it is within the sound discretion of a trial judge to excuse a juror for any reason personal to the juror that the judge deems sufficient. See 33 Fla. Jur. 2d, Juries, § 72 (2010); Jones v. State, 749 So.2d 561, 562 (Fla. 2d DCA 2000) (noting that subsections (5) and (6) of section 40.013 implicate the trial court’s discretion).
The trial court acted within its discretion as it relates to each of the challenged jurors. Each of the excused prospective jurors provided a reason explaining why serving would present a hardship or extreme inconvenience. It appears that the trial judge excused jurors for hardship in a consistent manner across the venire. Accordingly, the trial court did not abuse its discretion relating to these jurors.
Limitation of Cross-Examination
“Cruising”
Next on appeal, Patrick argues that he was unable to present his defense because the trial court limited his ability to cross-examine witnesses regarding the victim’s inclination to pick up men at the park and bring them home. Patrick alleges that the State’s theory was that Patrick targeted the victim, when in reality, the victim was the aggressor. Because we find that the evidence was not relevant, the trial court did not abuse its discretion in prohibiting Patrick from presenting testimony relating to Schumacher’s habit of “cruising” the park to pick up men.
The standard of review of a trial court’s ruling on a motion in limine is abuse of discretion. See Dessaure v. State, 891 So.2d 455, 466 (Fla.2004). Such discretion is limited by the rules of evidence, and a trial court abuses its discretion if its ruling is based on an “erroneous view of the law or on a clearly erroneous assessment of the evidence.” McDuffie v. State, 970 So.2d 312, 326 (Fla.2007) (citation omitted).
Every defendant is entitled to present any evidence that tends to support the defendant’s theory of defense. See Vannier v. State, 714 So.2d 470, 472 (Fla. 4th DCA 1998). “[W]here evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant’s guilt, it is error to deny its admission. § 90.404(2)(a), Fla. Stat. (1985). However, the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.” See Rivera v. State, 561 So.2d 536, 539 (Fla.1990). “Relevant evidence is evidence tending to prove or disprove a material fact.” § 90.401, Fla. Stat.
Edwards v. State, 39 So.3d 447, 448-49 (Fla. 4th DCA 2010).
The testimony excluded by the trial court’s ruling on the motion in limine was that the victim had a habit of picking up men at the park where he met the defendant. Patrick argues that this testimony demonstrated that he, Patrick, was not the aggressor in the case because Schumacher picked him up. This evidence was not relevant to prove or disprove any material fact relating to the State’s case against Patrick or Patrick’s defense.
As it relates to Patrick’s ability to present his theory of imperfect self-defense, the testimony was not relevant because it did not demonstrate the relationship between the defendant and the victim.[3] Fur *1057 thermore, the State of Florida does not recognize a nonviolent homosexual advance as sufficient provocation to incite an individual to lose self-control and commit acts in the heat of passion. See Davis v. State, 928 So.2d 1089, 1120 (Fla.2005) (discussing Davis’s claim that counsel was ineffective for failing to further a sexual advance defense). The jury was able to hear from Patrick, as well as from the Lyons, that Patrick’s relationship with Schumacher began as a welcomed guest in Schumacher’s home. Whether Patrick “targeted” Schu-macher from the instant they met, or whether Schumacher in fact “picked up” Patrick bears no reasonable effect on the outcome of the case or Patrick’s defense. Even if Schumacher “picked up” the defendant, it was many days later that Patrick killed him. The trial court did not limit Patrick’s ability to explain his theory of “imperfect self-defense.” Accordingly, the trial court did not err in granting the State’s motion in limine finding that the evidence would be more prejudicial then probative.
Diez
Next, Patrick alleges that the trial court improperly limited his ability to cross-examine Martin Diez, a jailhouse informant, relating to his state of mind. Patrick alleges that Diez only came forward because he believed his cooperation with law enforcement would benefit him with his own case. Patrick argues that this information would help the jury determine Diez’s credibility. We disagree. What Diez hoped to gain for his cooperation is not relevant testimony. We find that the trial court did not abuse its discretion in limiting cross-examination on Diez’s hopes regarding coming forward.
This Court reviews limitations on cross-examination of a witness for abuse of discretion. See McDuffie, 970 So.2d at 324 (citing Boyd v. State, 910 So.2d 167,185 (Fla.2005)); McCoy v. State, 853 So.2d 396, 406 (Fla.2003). Further, this Court has noted that
[a] trial court’s discretion in this area ... is constrained by the rules of evidence, Johnston v. State, 863 So.2d 271, 278 (Fla.2003), and by recognition of a criminal defendant’s Sixth Amendment rights. “The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one’s accusers. One accused of crime therefore has an absolute right to full and fair cross-examination.” Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982). As the United States Supreme Court explained in Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974):
Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.
The scope of cross-examination is not without bounds, but “where a criminal defendant in a capital ease, while exercising his sixth amendment right to confront and cross-examine the witnesses against him, inquires of a key prosecution witness regarding matters which are both germane to that witness’s testimony on direct examination and plausibly relevant to the defense, an abuse of discretion by the trial judge in curtailing *1058 that inquiry may easily constitute reversible error.” Coxwell v. State, 361 So.2d 148, 152 (Fla.1978).
McDuffie, 970 So.2d at 324-25. Relating to capital eases, this Court has said:
[w]e have long recognized the right of a defendant in a capital case to fully cross-examine those witnesses called by the prosecution:
It is too well settled to need citation of authority that a fair and full cross-examination of a witness upon the subjects opened by the direct examination is an absolute right, as distinguished from a privilege, which must always be accorded to the person against whom the witness is called and this is particularly true in a criminal case such as this wherein the defendant is charged with the crime of murder in the first degree. For the sake of emphasis we make the observation that at the time of the proposed cross-examination appellant stood in jeopardy of being convicted of such capital offense. Cross-examination of a witness upon the subjects covered in his direct examination is an invaluable right and when it is denied to him it cannot be said that such ruling does not constitute harmful and fatal error. Moreover, the right of cross-examination stems from the constitutional guaranty that an accused person shall have the right to be confronted by his accusers.
Coco v. State, 62 So.2d 892, 894-95 (Fla.1953). “[Cjross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief-” Boyd, 910 So.2d at 185 (quoting Coco, 62 So.2d at 895).
McDuffie, 970 So.2d at 325. Additionally, this Court has provided “that it is ‘fatal error for the trial court to deny defense counsel the right of cross-examination for the purpose of laying a predicate for impeachment.’ ” Id. at 326 (quoting Coco, 62 So.2d at 896).
Here, the trial court did not curtail cross-examination in matters “plausibly relevant to the defense.” What Diez hoped to gain for his cooperation is not relevant testimony. Furthermore, during the cross-examination of Diez, counsel was able to impeach Diez regarding his many instances of being a jailhouse informant. Additionally, the jury heard that Diez had been awaiting trial when he came forward, that Diez was convicted prior to giving his deposition in Patrick’s case and sentenced before Patrick went to trial. The jury further heard that Diez was not promised anything and although he had faced multiple life sentences, he was only sentenced to twenty years’ imprisonment. The jury had sufficient information to weigh the credibility of this witness. Patrick’s defense was not hindered by the limitation. Accordingly, the trial court did not abuse its discretion.
Voluntary Intoxication
Patrick next alleges that the trial court’s voluntary intoxication instruction constituted an impermissible comment on the evidence. Because the court’s instruction followed the language of the statute, Patrick’s claim is without merit.
A trial court has wide discretion in instructing the jury, and the court’s decision regarding the charge to the jury is reviewed with a presumption of correctness on appeal. Carpenter v. State, 785 So.2d 1182, 1199-1200 (Fla.2001). Jury instructions must include all essential and material elements of the crime charged. State v. Delva, 575 So.2d 643, 644 (Fla.1991).
*1059 Voluntary intoxication was a defense to specific intent crimes under Florida common law. See Garner v. State, 28 Fla. 113, 9 So. 835 (Fla.1891); Linehan v. State, 442 So.2d 244, 246 (Fla. 2d DCA 1983), approved on other grounds, 476 So.2d 1262 (Fla.1985). As of October 1, 1999, the Florida Legislature eliminated the defense. See § 775.051, Fla. Stat. (1999).
Lewis v. State, 817 So.2d 933, 933 (Fla. 4th DCA 2002). In Gibbs v. State, 904 So.2d 432, 437 (Fla. 4th DCA 2005), the Fourth District addressed this question. Gibbs argued “that the court erred in instructing the jury that voluntary intoxication is not a defense to any offense proscribed by law.” He further argued “that the instruction amounted to an improper judicial comment. ...” The Fourth District disagreed, stating:
As of October 1, 1999, the Florida Legislature eliminated the defense of voluntary intoxication. § 775.051, Fla. Stat. (1999); Lewis v. State, 817 So.2d 933, 933 (Fla. 4th DCA 2002). The trial court’s instruction tracked the language of section 775.051. While [the defendant] argues that the instruction constituted a comment on the evidence, it was a correct statement of the law. Intoxication could not be used to suggest that he lacked the necessary mental state to commit the crime. We deem [the defendant’s] argument that intoxication could be used to suggest that the incident was an accident as opposed to a crime that occurred out of ill will is tantamount to an argument that voluntary intoxication negated the intent necessary to convict [the defendant] of second degree murder. As second degree murder is a general intent crime, voluntary intoxication is not a defense to the charge even without the effect of the statute. See Kiley v. State, 860 So.2d 509, 510 n. 1 (Fla. 4th DCA 2003).
Gibbs, 904 So.2d at 437. Like the defendant in Gibbs, Patrick repeatedly raised the issue of his intoxication on the night of the murder. In his statement to police, which was played at trial, Patrick repeatedly mentioned how much he had drunk, how he had been “eating” pills, and that he was paranoid because of his intoxication. Although he alleges that he was not seeking a voluntary intoxication defense, the evidence presented could have led a jury to believe that premeditation didn’t exist due to his intoxication. See, e.g., Kramer v. State, 619 So.2d 274, 277 (Fla.1993) (“In effect, the defense raised voluntary intoxication albeit without asking for the instruction.”). Accordingly, the trial court did not err in instructing the jury on the current status of the law — that voluntary intoxication is not a defense.
Motion to Suppress
Next, Patrick alleges that the trial court erred in denying his motion to suppress his confession to the police and the items found pursuant to the search of his duffel bag. He argues that this evidence was fruit of the poisonous tree because Deputy Bukata illegally detained him during their initial encounter. Because there is competent, substantial evidence in the record to support the trial court’s ruling, we deny relief on this claim.
“A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Rolling v. State, 695 So.2d 278, 291 (Fla.1997) (citing McNamara v. State, 357 So.2d 410, 412 (Fla.1978)). “We defer to a trial court’s findings of fact as long as they are supported by competent, *1060 substantial evidence, but we review de novo a trial court’s application of the law to the historical facts.” Ross v. State, 45 So.3d 403, 414 (Fla.2010), cert. denied, — U.S.-, 131 S.Ct. 925, 178 L.Ed.2d 803 (2011).
This Court described consensual encounters in Taylor v. State, 855 So.2d 1, 14-15 (Fla.2003).
We have explained that there are essentially three levels of encounters an individual can have with the police:
The first level is considered a consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer’s requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151 Fla. Stat. (1991). In order not to violate a citizen’s Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.
... [T]he third level of police-citizen encounters involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15 Fla. Stat. (1991).
Popple v. State, 626 So.2d 185, 186 (Fla.1993) (citation omitted).
Taylor, 855 So.2d at 14-15.
The record demonstrates that on September 27, 2005, Deputy Bukata approached Patrick at a BP gasoline station on Atlantic Boulevard in Pompano Beach, Florida. Patrick gave Bukata his name and date of birth. Patrick then attempted to give his identification number by memory, but Bukata recognized that it did not match Patrick’s date of birth. Patrick picked up his belongings and requested to leave, which Bukata permitted. This ended the initial — consensual—encounter. Bukata ran a check based on Patrick’s name and discovered an outstanding warrant. Bukata then drove after Patrick and arrested him for the warrant. Patrick confessed to the crimes against Schumacher after he was arrested. Based on this information, it is clear from the record that Patrick was not detained until he was arrested. He walked away from Deputy Bu-kata after providing his information and asking to leave. The fact that Bukata had to drive to catch up with Patrick indicates that Patrick was not detained as alleged. As in Taylor, the record indicates that Patrick’s “dealings with the police progressed through each of these three stages.” However, it is clear that the initial encounter was consensual because Patrick not only felt free to leave, he then left. The second contact consisted of a legal arrest based on the outstanding warrant Bukata found in his search. Because this encounter did not constitute an illegal detention, the trial court properly denied Patrick’s motion to suppress the evidence.
Autopsy Photographs
Next, Patrick argues that the admission of gruesome photographs during *1061 the trial was improper. Patrick concedes that the photographs would have been admissible if required by the medical examiner to explain medical testimony, but states that these photographs were superfluous to such testimony. The State argues that the trial court did not err because Dr. Juste stated that some jurors might understand her testimony better with the aid of the photographs. We agree with the State and find no error.
“A trial court’s ruling on the admission of photographic evidence will not be disturbed absent a clear showing of abuse of discretion.” Davis v. State, 859 So.2d 465, 477 (Fla.2003) (quoting Mansfield v. State, 758 So.2d 636, 648 (Fla.2000)). Photographs are subject to the section 90.403, Florida Statutes (2008), balancing test. Pursuant to section 90.403, “Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. (2008).
In Czubak v. State, 570 So.2d 925 (Fla.1990), this Court discussed the admissibility of gruesome photographs:
This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance. Where photographs are relevant, “then the trial judge in the first [instance] and this Court on appeal must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unim-passioned consideration of the evidence.” We have consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence.
Id. at 928 (citations omitted).
Hertz v. State, 803 So.2d 629, 641 (Fla.2001). Further, we have consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield, 758 So.2d at 648.
Autopsy photographs that are relevant to show the manner of death, location of wounds, and the identity of the victim or to assist the medical examiner in explaining the victim’s injuries are generally admissible evidence. See Ault v. State, 53 So.3d 175, 198-200 (Fla.2010) (concluding that the trial court did not abuse its discretion in admitting four relevant autopsy photographs that were not unduly prejudicial during Ault’s new penalty phase trial on resentencing), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011); see also Rose, 787 So.2d 786, 794-95 (Fla.2001). We have explained that:
Photographs are admissible if “they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted.” Bush v. State, 461 So.2d 936, 939 (Fla.1985). Moreover, photographs are admissible “to show the manner of death, location of wounds, and the identity of the victim.” Larkins v. State, 655 So.2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury. However, a trial court’s decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So.2d at 648.
Ault, 53 So.3d at 198-99 (quoting Brooks v. State, 787 So.2d 765, 781 (Fla.2001)). “The mere fact that photographs may be gruesome does not mean they are inadmissi *1062 ble.” Ault, 53 So.3d at 199 (quoting Harris v. State, 843 So.2d 856, 864 (Fla.2003)). To be relevant, however, “a photo of a deceased victim must be probative of an issue that is in dispute.” Almeida v. State, 748 So.2d 922, 929 (Fla.1999).
Here, the photographs that were ultimately introduced into evidence depicted the skin of the victim’s head pulled back to reveal his skull and the entire torso opened to reveal his upper chest. These photographs were provided to demonstrate the internal injuries sustained since they were not otherwise visible. Dr. Juste was questioned by the parties and the court about which autopsy photographs she needed for her testimony and after a review of the photographs most were eliminated. The ones that remained, Dr. Juste stated that she was unsure whether people would understand her testimony without them. She stated:
I don’t know whether you can or cannot understand from my description of the injuries. I really don’t know. Some people can easily picture, you know, what you’re saying when you’re saying words, but other people might need to actually see what you are talking about.
We find the photographs relevant to a probative issue and that the trial court properly admitted them into evidence.
Closing Argument
Patrick next argues that during closing arguments the prosecutor unfairly attacked Patrick’s character, improperly asked jurors to convict him due to his lack of remorse, and appealed to the fears and prejudices of the jury. The record indicates that Patrick did not object to any of the alleged improper comments. Because we find that none of the contested comments are so egregious as to constitute fundamental error, this claim is procedurally barred.
Motion for Judgment of Acquittal
Next, Patrick alleges that the trial court erred by denying his motion for judgment of acquittal. Specifically, Patrick states that the trial court mistakenly believed premeditation to be a question of fact, not a question of law. Based on a review of the record, we find the evidence sufficient for the jury to consider premeditation. Accordingly, we find that the trial court did not err.
In Pagan v. State, 830 So.2d 792, 803 (Fla.2002), this Court set forth the appropriate standard of review for a motion for judgment of acquittal:
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See Tibbs v. State, 397 So.2d 1120 (Fla.1981). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. See Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. See Banks v. State, 732 So.2d 1065 (Fla.1999). However, if the State’s evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant’s reasonable hypothesis of innocence. See Orme v. State, 677 So.2d 258 (Fla.1996).
If the State presents both direct and circumstantial evidence, courts do not apply the special standard of review applicable to *1063 circumstantial evidence cases.[4] Pagan, 830 So.2d at 803. “A motion for judgment of acquittal should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.” Coday v. State, 946 So.2d 988, 996 (Fla.2006); see, e.g., Taylor v. State, 583 So.2d 323, 328 (Fla.1991).
The evidence introduced at trial included both direct and circumstantial evidence. A review of the record demonstrates that there was competent, substantial evidence to submit the question of premeditation to the jury.
Relating to premeditation, this Court has explained:
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Bigham v. State, 995 So.2d 207, 212 (Fla.2008) (citations and internal quotation marks omitted). The record here demonstrates sufficient evidence for the jury to have inferred that Patrick did intend for Schumacher to die.
The evidence introduced at trial showed that Patrick beat Schumacher first with his hands, and then with a wooden box so badly that Schumacher’s face split open. Schumacher sustained a laceration to his left cheek and left side of his face at the corner of his mouth, lacerations to his left jaw and right chin region, contusions to his upper lips, and the loss of some teeth. Additionally, Schumacher had hemorrhages on the right and left sides of his head, showed internal cranial and subdural hemorrhaging, a swollen brain, and hemorrhaging in his neck and voice box. Patrick bound and “hog-tied” Schumacher and left him in the bathtub for several days until he was found. Although the medical examiner’s evidence demonstrated that Schu-macher was likely alive after his beating and strangulation, Patrick himself admitted that Schumacher, a seventy-three year-old man, was not likely to survive being left hog-tied and gagged with his face duct-taped with only his nostrils free. Accordingly, there was sufficient evidence of premeditation to submit to the jury for consideration. See Wysocki v. State, 715 So.2d 346, 347 (Fla. 4th DCA 1998) (evidence of premeditation sufficient where appellant beat the victim with a pool cue stick while his co-defendant struck him with a bat and crystal bowl and both left the victim lying unconscious after the attack); Thomas v. State, 456 So.2d 454, 457 (Fla.1984) (evidence of premeditation sufficient where the victim was beaten, kicked, or bludgeoned so severely that his skull was fractured in many places; he was rendered unconscious and not treated until he was discovered the next day; and died without ever regaining consciousness). Thus, the trial court did not err in denying Patrick’s motion for judgment of acquittal.
Cumulative Error in the Guilt Phase
Patrick argues that the cumulative effect of the trial court’s errors during the guilt phase deprived him of a fair trial and undermines the confidence of his conviction. Because we do not find any error in the guilt phase, this claim must fail. *1064 See Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (“However, where the alleged errors urged for consideration in a cumulative error analysis are individually ‘either procedurally barred or without merit, the claim of cumulative error also necessarily fails.’ ”) (quoting Israel v. State, 985 So.2d 510, 520 (Fla.2008)).
Sufficiency
This Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Bright v. State, 90 So.3d 249 (Fla.2012). “ ‘In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.’ ” Id. at 258 (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
Sufficient evidence exists in the record for the jury to convict Patrick of first-degree felony murder or first-degree premeditated murder. There is no dispute that Patrick caused Schumacher’s death. Thus, the question for this Court is whether the evidence was sufficient to establish either felony-murder or premeditation. We find that the evidence is sufficient to establish either theory of first-degree murder.
The record reflects that Patrick confessed to beating Schumacher with his fists and a wooden box. The evidence presented is consistent with this having occurred. Further, Patrick admitted and the evidence supports that he hog-tied Schumacher and placed him in the bathtub on his stomach after wrapping Schumacher’s face and head in tape. Thereafter, the evidence demonstrates that Patrick took Schumacher’s truck, ATM card, watch, and some money from his wallet. Patrick withdrew approximately $900 from Schu-macher’s account before discarding the card. Patrick confessed to Diez that he planned to target a homosexual to take his money and kill him. Viewing the evidence in the light most favorable to the State, the record supports that Patrick beat Schu-macher because he would not reveal his ATM PIN, which is consistent with the murder having occurred to facilitate a robbery. Additionally, the length of the beating, the fact that Patrick returned to the house to check on Schumacher, and the attempted staged alibi is consistent with the State’s theory that Patrick killed Schu-macher with a premeditated design. Accordingly, there is sufficient evidence to sustain Eric Kurt Patrick’s conviction for the first-degree murder of Steven Schu-macher.
Standard Jury Instructions
Patrick argues that the standard jury instructions impermissibly dilute the jury’s sense of responsibility. We find this claim without merit. We have repeatedly rejected this argument, stating that “the standard penalty phase jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury and do not violate Caldwell v. Mississippi, 472 U.S, 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).” Janes v. State, 998 So.2d 573, 590 (Fla.2008) (citations omitted). Accordingly, we deny relief on this claim.
Penalty Phase Closing Arguments

Prosecutor’s Comments

Patrick contends that the prosecutor made improper arguments during the penalty phase closing and that he is entitled to a new penalty phase. Because Patrick failed to object and because we find that the comments do not constitute fundamental error, we deny relief on this claim.

*1065
Limitation of Defense Closing

Patrick next argues that the trial court improperly limited his closing argument and that he should have been allowed to argue the “reasonable inferences” from the imposition of a sentence of life imprisonment term without parole. We find this claim without merit.
Closing arguments allow the State and defense to review the evidence and to explicate those inferences that may reasonably be drawn from the evidence. Dess ante, 891 So.2d at 468. This Court has stated that “courts of this state allow attorneys wide latitude to argue to the jury during closing argument. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments.” Thomas v. State, 748 So.2d 970, 984 (Fla.1999) (citations omitted). However, counsel may not urge the jury to consider facts not in evidence. See Jackson v. State, 522 So.2d 802, 808 (Fla.1988).
The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.
Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985).
The conditions of the prison where Patrick was incarcerated were not facts in evidence during the trial or the penalty phase. Patrick alleges that the trial court improperly limited his penalty phase expert’s testimony because the trial court would not permit slides depicting the electric chair, the lethal injection gurney, or jail cells during the expert’s testimony. Further, the court excluded pictures depicting Nazi Germany. Because the excluded photographic slides appear to have been more inflammatory than probative, the trial court did not err.
Sentencing Order Errors
Patrick argues that the sentencing order contains numerous errors that individually and cumulatively require reversal of his sentence. The substance of this claim is that the trial court: (1) improperly weighed the aggravators, (2) improperly doubled one of the aggravators, (3) improperly found the felony murder aggra-vator, (4) improperly found HAC, (5) improperly found CCP, (6) improperly found “victim vulnerable due to age or infirmity,” (7) should have found statutory mitigation of extreme mental or emotional distress, and (8) improperly weighed non-statutory mitigation.
Weight Assigned to Aggravators
“The weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard.” Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006). “[Discretion is abused only where no reasonable man would take the view adopted by the trial court.” Id. (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)). Patrick alleges error relating to the weight assigned to the “under felony supervision,” “prior violent felony,” and “felony murder” aggravators. We conclude that the trial court did not abuse its discretion in assigning “great weight” to these aggravating factors.
Improper Doubling
Patrick claims there was improper doubling because the trial court found both “prior violent felony” and “under felony supervision.” This claim is without merit. “Improper doubling occurs when aggravating factors refer to the same aspect of the crime.” Green v. State, *1066 641 So.2d 391, 395 (Fla.1994) (citing Provence v. State, 337 So.2d 783, 786 (Fla.1976)). This Court has previously rejected the claim of improper doubling where the prior violent felony referred to the conviction and under felony supervision referred to the defendant’s status at the time of the murder. See Rose, 787 So.2d at 801; Muhammad v. State, 494 So.2d 969, 976 (Fla.1986).
Felony Murder
Patrick claims the felony murder aggra-vator constitutes double jeopardy. This claim is without merit. See Lukehart v. State, 776 So.2d 906, 922 (Fla.2000) (“Simply put, [a] defendant can be convicted of both felony murder and the qualifying felony because the felony murder statute says so.”) (quoting Green v. State, 680 So.2d 1067, 1068 (Fla. 3d DCA1996)).
Victim Vulnerability
Patrick alleges that the victim vulnerability aggravator is unconstitutional. This claim is without merit. We have previously upheld the constitutionality of this ag-gravator. See Francis v. State, 808 So.2d 110, 138 (Fla.2001).
Weight Assigned Mitigation
As with the weight assigned aggravating factors, the weight assigned mitigation is within the sole discretion of the trial court. Patrick has not alleged with specificity which factor should have been given more weight, or the grounds for his assertion. Accordingly, this claim is without merit.
Extreme Mental or Emotional Distress
Patrick alleges that the trial court erred by failing to find extreme mental or emotional distress. The trial court’s findings are supported by competent, substantial evidence. In Durousseau v. State, 55 So.3d 543, 560 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011), this Court stated:
This Court will not disturb a trial court’s rejection of a mitigating circumstance if the record contains competent, substantial evidence to support the trial court’s rejection of the mitigation.- See Spencer v. State, 645 So.2d 377, 381, 385 (Fla.1994); Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). There must be a rational basis for the trial court’s rejection of such mitigation at a capital sentencing proceeding. Lebron v. State, 982 So.2d 649, 660 (Fla.2008). “[T]he trial court may accept or reject the testimony of an expert witness just as the judge may accept or reject the testimony of any other witness.” Roberts v. State, 510 So.2d 885, 894 (Fla.1987). The trial court is entitled to reject apparently un-rebutted testimony of a defense mental health expert if the trial court finds that the facts do not support the testimony. See generally Nelson v. State, 850 So.2d 514, 531 (Fla.2003).
Here, Patrick did not present evidence of mental health mitigation to the jury. The evidence Patrick relies on was presented only at the Spencer hearing, which the trial court properly considered as non-statutory mitigation. Accordingly, the trial court did not err in not finding the statutory mitigator.
HAC
Patrick argues that the trial court erred in finding HAC because the medical examiner could not determine the sequence of events and could not determine whether Schumacher remained conscious throughout the attack.
[This Court has] upheld the HAC ag-gravator in numerous cases involving beatings. Lawrence v. State, 698 So.2d 1219, 1221-22 (Fla.1997) (“We have consistently upheld HAC in beating deaths.”); see also, e.g., Colina v. State, 634 So.2d 1077, 1081 (Fla.1994) (holding that the HAC aggravator applied where *1067 one of the defendants hit the victim, who fell to the ground, and when that victim attempted to get to his feet, the other defendant hit him several times in the back of the head with a tire iron); Owen v. State, 596 So.2d 985, 990 (Fla.1992) (upholding the HAC aggravator where the sleeping victim was struck on the head and face with five hammer blows); Lamb v. State, 532 So.2d 1051, 1053 (Fla.1988) (upholding the HAC aggravator where the defendant struck the victim six times in the head with a claw hammer, pulled his feet out from under him, and kicked him in the face); Heiney v. State, 447 So.2d 210, 216 (Fla.1984) (upholding the HAC aggravator where seven severe hammer blows were inflicted on the victim’s head).
Buzia, 926 So.2d at 1212.
Here, by Patrick’s own admission, Schu-macher was screaming for help, which led Patrick to cover Schumacher’s mouth, face, and head with tape. Further, Patrick confessed that Schumacher continued to mumble after he was put into the bathtub. The blood evidence showed pools of blood in the bedroom and in the bathtub. Patrick’s confession demonstrates that Schumacher was not unconscious during his beating. Nothing in the record indicates how long he lived after he was beaten, hog-tied, and left in the bathtub on his stomach, but it is likely that he was aware of his impending death. The finding of HAC is consistent with this Court’s holdings in other beating death eases. See Russ v. State, 73 So.3d 178, 196-97 (Fla.2011); Willacy v. State, 696 So.2d 693, 696 (Fla.1997).
CCP
Patrick alleges that the court erred in finding CCP because there was no evidence of a careful plan or that he procured a weapon. We agree.
In order to establish the CCP aggra-vator, the evidence must show: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)”; (3) “the defendant exhibited heightened premeditation (premeditated)”; (4) “the defendant had no pretense of moral or legal justification.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2001)). “Premeditation can be established by examining the circumstances of the killing and the conduct of the accused.” Franklin, 965 So.2d at 98. Further, “the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.” Thompson v. State, 565 So.2d 1311, 1318 (Fla.1990). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’” Franklin, 965 So.2d at 98 (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)).
Williams v. State, 37 So.3d 187, 195 (Fla.2010).
Here, the trial court based its finding of CCP largely on Patrick’s statements to Diez and his actions to cover up the crime. The only evidence that the trial court relied on that was not part of the cover-up was that Patrick told Diez that he planned to kill the victim. The evidence is insufficient to demonstrate heightened premeditation.
The trial court based its finding of CCP on:
*1068 a. Defendant told a cell mate, Martin Dietz, that he had planned to kill the victim.
b. Defendant put the victim in the bath tub, bound and gagged him so the victim would not cry out for help and after killing the victim, pulled the shower curtain closed to conceal the body.
c. Defendant cleaned up the crime scene....
d. Defendant packed a lunch and left it in the victim’s truck that he had stolen as a part of his alibi that he had been at work when the murder occurred.
e. Defendant set the thermostat in the apartment to sixty (60) degrees to slow down the decay of the body.
... The element of premeditation is supported not merely by the method used to kill (strangulation, the forceful blows to the victim’s face, knocking out three teeth, and the blows to the head with the wooden box) but by Defendant’s statements to Dietz....
Patrick did not procure the weapon in advance, did not lie in wait to attack Schumacher, see, e.g., Buss, 73 So.3d at 192, and did not appear to carry out the murder as a matter of course. With these factors missing, the trial court’s finding of the CCP aggravator is not supported by competent, substantial evidence. See Williams, 37 So.3d at 196 (“All of the hallmarks of a killing that has been found to be CCP are missing in this case, including ‘such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ”) (quoting Franklin v. State, 965 So.2d 79, 98 (Fla.2007)). Accordingly, we strike this aggra-vator.
Harmless Error
“When this Court strikes an aggravating factor on appeal, ‘the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.’ ” Williams v. State, 967 So.2d 735, 765 (Fla.2007) (quoting Jennings v. State, 782 So.2d 853, 863 n. 9 (Fla.2001)); see also Douglas v. State, 878 So.2d 1246, 1268 (Fla.2004). In the present case, as discussed below, Patrick has five remaining aggravators, including two of the weightiest, and very little mitigation. In light of this, striking the CCP aggravator does not result in reversible error because there is no reasonable probability that the error affected the sentence.
Proportionality
Patrick claims that the death sentence in this case is disproportionate. The trial court found six aggravators, including three of the weightiest, and only gave little to some weight to Patrick’s mitigation. Although we find that the evidence is insufficient to support the application of CCP, we nevertheless find that Patrick’s sentence is proportionate. See Russ, 73 So.3d at 197-99.
Constitutionality of the Death Sentence
As conceded by Patrick, this claim is without merit. We have repeatedly upheld the constitutionality of the state’s capital punishment statute and process as currently administered especially where the prior violent felony aggravator is present. See, e.g., Hall v. State, 87 So.3d 667, 671 n. 4 (Fla.2012) (citing Bryant v. State, 901 So.2d 810, 823 (Fla.2005)). Even if a federal court has found Florida’s death penalty statute unconstitutional as applied in an unpublished order, that decision has no precedential value in this Court. State v. Dwyer, 332 So.2d 333, 335 (Fla.1976).
Cumulative Error
Patrick’s final claim is that the cumulative effect of the alleged errors in *1069 both the guilt and penalty phases of his trial requires that he receive a new trial. “It is appropriate to evaluate claims of error cumulatively to determine if the errors collectively warrant a new trial.” Rogers v. State, 957 So.2d 538, 553 (Fla.2007) (citing Suggs v. State, 923 So.2d 419, 441-42 (Fla.2005)). However, because the bulk of Patrick’s individual claims are without merit, his cumulative error claim must fail. See Hoskins v. State, 75 So.3d 250, 258 (Fla.2011); Schoenwetter v. State, 46 So.3d 535, 553 (Fla.2010); Rogers, 957 So.2d at 554; Parker v. State, 904 So.2d 370, 380 (Fla.2005); Griffin v. State, 866 So.2d 1, 22 (Fla.2003) (“[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail.”); Vining v. State, 827 So.2d 201, 219 (Fla.2002) (holding that where alleged individual errors are without merit, the contention of cumulative error is similarly without merit); Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999) (concluding that where allegations of individual error do not warrant relief, a cumulative error argument based thereon is without merit). Accordingly, Patrick is not entitled to relief on this claim.
CONCLUSION
For the foregoing reasons we affirm Patrick’s conviction and sentence for the murder of Steven Schumacher.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

. The aggravators found were:
(1)Patrick was under a sentence of imprisonment (great weight);
(2) Patrick had a prior violent felony (great weight);
(3) the murder occurred in the course of a felony (great weight);
*1055 (4) pecuniary gain (merged with felony murder);
(5) the murder was heinous, atrocious, and cruel (HAC) (great weight); and
(6) the murder was cold, calculated, and premeditated (CCP) (great weight).

. The mitigating circumstance found were:
(1) Patrick's father was physically and mentally abusive (little weight);
(2) Patrick had a tragic youth (little weight);
(3) his childhood was unstable (little weight);
(4) there was family abuse (some weight);
(5) substance abuse from an early age (little weight);
(6) Patrick suffered from severe drug abuse at the time of the crime (some weight);
(7) Patrick sought absolution and forgiveness (little weight);
(8) Patrick had remorse (some weight);
(9) he loves his family (little weight);
(10) Patrick is close to his mother (some weight);
(11) his brother attended the trial (little weight);
(12) Patrick confessed (little weight);
(13) he had good conduct throughout the trial (little weight);
(14) he suffered from emotional stress combined with a history of family dysfunction (little weight);
(15) he had experienced childhood sexual abuse and exploitation (some weight); and
(16) he had some mental health history as discussed in number 14 (little weight).

. Additionally, Florida does not recognize imperfect self-defense. See Hill v. State, 979 So.2d 1134, 1135 (Fla. 3d DCA 2008) ("The *1057 Florida [murder] statute does not contain a provision on imperfect self-defense.”)

. As this Court has recognized, "Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist.” Baugh v. State, 961 So.2d 198, 203 n. 5 (Fla.2007) (quoting Davis v. State, 90 So.2d 629, 631 (Fla.1956)).